## SCHNEIDER VS. EVANS.

RAILROADS — COMMON CARRIERS: *Carriage of goods by several connecting lines — Guaranty by first company as to total cost — Rights of the subsequent carriers.*

A railroad company received goods at Pittsburg, Pa., destined for Hudson, Wis., stipulating against responsibility as a carrier beyond its own line, but guarantying that the cost of transportation to Hudson should not exceed a certain sum, — *less* than the aggregate of the charges on the several lines between Pittsburg and Hudson at the usual rates; the other connecting lines on the route having no knowledge or notice of the guaranty. *Held:*

1. That this was not a " through contract."

2. That even if there had been a "through contract," the other facts remaining, the rights of the successive carriers would be as hereinafter stated.

3. That each carrier after the first might charge, and pay back charges, *at the usual rates;* and the last (or the warehouseman who received from it, paying back charges) had a lien on the goods for the total amount of such charges.

4. That the remedy of the shipper is against the first carrier, on the guaranty.

5. Whether the result in this case would be different if the other carriers had had notice of the guaranty, *quære.*

APPEAL from the Circuit Court for *St. Croix* County.

Replevin. The facts were stipulated as follows: 1. That the plaintiff is owner of the property described in the complaint, and the same is of the value there alleged. 2. That said property was delivered to the Pittsburg, Fort Wayne and Chicago Railway Company, at Pittsburg, Penn., by the plaintiff's duly authorized agent, to be transported to the plaintiff at Hudson, Wis., and that at the time of said delivery the said railway company, by its duly authorized agent, executed and delivered to the plaintiff a certain agreement in writing [which is annexed to the stipulation, and is recited *infra*]; that said property was delivered to said company pursuant to said agreement, and received by the company subject to the conditions therein set forth. 3. That said property was transported by the Pittsburg, Fort Wayne and Chicago Railway Company to Chicago, and by the Chicago and Northwestern Railway Company, and the Prairie du Chien and Milwaukee Railway Company, from Chicago to Prairie du Chien, and by the Minnesota Packet Company from Prairie du Chien to Hudson, and by the latter delivered to the defendants as warehousemen; that each of said last named companies received the goods from the one preceding it, in the order in which they are named, as a common carrier, and without notice of the agreement above mentioned; that in thus receiving them, "they and each of said companies acted independently and each for itself, and not as a continuous line of transportation interested together in such transportation business;" that each of said railway companies, after the one first mentioned, together with said packet company, "charged its 'card rates' which they had published as their rates for transporting goods over their respective roads, and on the Mississippi river and tributaries," at that time. 4. That each of the two last-mentioned railway companies, as well as the packet company, had no knowledge whatever of the special agreement above mentioned; that each, on receiving the

goods, paid to the previous carrier all back charges for freight or storage or other expense chargeable to and on said property; that way-bills or bills of lading (other than the original way-bill or bill of lading given by the first-mentioned railway company), were given and made by the two last-mentioned railway companies, and said packet company, when the goods were placed in its possession. 5. That the various roads belonging to said railway companies, together with said packet company, form a direct route between Pittsburg and Hudson, and one of the usual routes used for transportation between said places. 6. That the transporting of said goods by all of said companies, and the paying of the charges thereon, and the receiving of the property by the defendants, and the paying of the charges thereon, were done by each and every of them without any authority from the plaintiff, and without any knowledge or assent or request by him, or in his behalf, other than that given by the delivery of the property to the Pittsburg, Fort Wayne and Chicago Railway Company as above stated. 7. That there is a general and long-established custom and usage among railway companies in the western states, and the owners of steamboats used upon the Mississippi river and its tributaries, whereby, when a railway company, or a steamboat company or owner, receives as a common carrier, for transportation over its line of railway, or on his or its steamboat, property which requires to be transported further, in order to reach its ultimate place of destination, they do so as follows : (1.) They carry the goods to the termination of their own line of transportation. (2.) They then require that a way-bill or bill of lading be made and delivered to them by the railway company, or the steamboat company or owner, that next receives the property to transport the same *en route* to the ultimate destination. (3.) They require such next carrier to advance, to the carrier so delivering the goods, all back charges thereon for freight, transportation and expenses,

including the charges of the carrier making such delivery. (4.) By general usage and custom long established, warehousemen on the Mississippi river and its tributaries, when they receive goods as such, advance all the back charges for freight and transportation, and claim the amount so advanced from the persons receiving the goods. 8. That each of the two last-mentioned railway companies, and said packet company, in receiving the goods here in dispute, acted upon the usage and custom above described; and that defendants received the property as warehousemen, and advanced all the back charges for the transportation thereof; that the amount so advanced exceeds that specified in the agreement above mentioned, and has not been paid to the defendants. 9. That before the commencement of this action, plaintiff tendered to defendants the amount due for the transportation of said property according to the conditions of the above-mentioned agreement, and also the amount of defendants' charges as warehousemen, and demanded possession of the property, which was refused.

The special agreement mentioned in and attached to the above stipulation, was a printed form with blanks filled in as usual, and was as follows: "Pittsburg, Fort Wayne and Chicago Railway Co. Received, Pittsburg, October 4th, 1866, of Singer, Nimick & Co., the following described packages, * * * consigned to *J. C. Schneider*, Hudson, state of Wisconsin, * * which we promise to transport * * over the line of this railway to the company's freight station at Chicago, and deliver * * to the consignee or owner, or to such company (if the same are to be forwarded beyond the limits of this railway) whose line may be considered a part of the route to the place of destination of said goods or packages; it being distinctly understood that the responsibility of this company as a common carrier shall cease at the station where such goods are delivered to such person or carrier; but it guaranties on its part.

and on the part of other companies, that the rate which he or they agree to pay for the transportation of said packages from the place of shipment to Hudson station shall not exceed $1.10 per 100 pounds, and charges, upon the following conditions." Then ·follow certain conditions, none of which are important here.

The circuit court found the facts in accordance with the above stipulation, and held that plaintiff was entitled to the possession of the property; and, having assessed the value thereof, and damages for the detention, it rendered judgment in plaintiff's favor; from which the defendants appealed.

*H. C. Baker*, for appellants:

1. It was competent for the Pittsburg, Fort Wayne and Chicago Railway Co., to limit its liability as a common carrier to the line of its own road; and, having done so, it acted, in delivering the goods to the next carrier, as an ordinary bailee for plaintiff, for the purpose of forwarding the goods. *Dorr v. N. J. Steam Nav. Co.*, 1 Kern. 485; *Detroit and Mil. R. R. Co. v. Bank*, 20 Wis. 122. 2. It being conceded that the first carrier acted simply as *forwarder* in delivering the goods to the second, that they were carried over the route intended by plaintiff, and that each of the independent lines after the first was ignorant of the special contract made with the first, it follows that plaintiff was charged with knowledge of, and is bound by, the general and long established custom among railroad companies in this country, and that the same is part of the contract. 2 Redfield on R. W. 120. 3. As the custody of the goods was to pass from the first company at Chicago, where its liability as common carrier ceased, to that of *independent lines*, who might charge a greater rate, the agreement that the cost of carriage should not exceed $1.10 per 100 lbs. became a *guaranty* that if plaintiff was compelled to pay a greater rate the first company would make good to him the excess. 4. The principle that, for the purpose of transhipment from one inde-

pendent route to another, each intermediate company is the agent of the consignee, is one which has grown up out of the necessities of commerce, and may be regarded as the settled law of this country. The first company, acting on plaintiff's behalf in forwarding the goods over the route selected, and having possession for that purpose, was clothed with authority to make any contract required by the usual course of business to accomplish that object. The independent line, to whose possession the goods came while *en route* for Hudson, were not charged with notice of any private understanding between plaintiff and his agent. When one of two persons must suffer by the act of a third, the injury should fall upon the one who places confidence in such third person, and not upon the innocent party. It would destroy the utility of the carrying business, as at present conducted in this country, over a series of independent lines of transportation, if each carrier were compelled to stop, before receiving goods in the usual course of business, to examine the authority of the person offering them to make the necessary contract for carriage. *Meyer v. Harnden's Exp. Co.*, 24 How. Pr. 290; Story on Agency, § 127 and notes. Counsel also criticised and distinguished cases cited on the other side.

*Henry Wilson* (with *Spooner, Lamb & Spooner*, of counsel), for respondents:

1. Carriers are bound to know the title and authority of the party delivering goods for carriage. Their protection against performing services without compensation lies in their right to demand their pay before rendering the service. If they waive this right, they rely upon the party delivering the goods, and their claim for compensation must stand or fall upon his authority in the premises. In this case the party delivering was authorized to transport the goods at a certain rate, but not at a greater rate; and they, having transported the goods and trusted to the authority of the party delivering to them, are bound by that

authority. *Fitch v. Newberry*, 1 Doug. (Mich.) 1; *Robinson v. Baker*, 5 Cush. 137; *Stevens v. B. & W. R. R. Co.*, 8 Gray, 262; *Clark v. R. R. Co.*, 9 id. 231; *Van Buskirk v. Purinton*, 2 Hall, 561. 2. The legal relation of defendants is that of bailees to the Pittsburg, Fort Wayne and Chicago Railway Co. The bailee can have no better title or greater rights than the bailor. Had the plaintiff paid that company for the transportation of the goods, could defendants, and those for whom they hold, have recovered from him? *Fitch v. Newberry; Hoffman v. Carow*, 22 Wend. 318; 1 Parsons on Con. (3d ed.), 679, note (*w*). 3. Whoever deals with an agent constituted for a special purpose, deals at his peril when the agent passes the precise limits of his power. 2 Kent's Comm. (7th ed.), 793; Story on Con. § 134. 4. Even if it be conceded that the subsequent carriers, being ignorant of the special agreement made by the first, had a right to charge their regular rates, it follows that the first had a right to charge only so much as, added to those rates, would make up to the agreed price of $1.10 per cwt. It follows, also, that the second carrier, when it advanced to the first a sum which, added to the rates of the others, was more than the agreed price to Hudson, paid the first money to which he was *not entitled*. If, then, a second carrier advances to the first money to which he is not entitled, can the second maintain a lien therefor on the goods? This question may arise in various ways. The freight of the first carrier may have been paid to him in advance, and the second, in ignorance of that fact, may pay it to him again on receiving the goods; or the first carrier, in delivering the goods to the second, may be *diverting* them from the route over which he agreed to send them, and the second, in ignorance of that fact, may advance the back charges; or, as in this case, the first carrier may, by his contract, preclude himself from charging as much as he allows a second carrier to advance to him for back charges. Cases of the first

kind· are reported in 37 Barb. 236, decided in 1862, and
6 Humph. (Tenn.), decided in 1845; of the second kind
in *Fitch v. Newberry*, 1 Doug. (Mich.) 1; and 5 Cush.
137; and one of the .third kind in 27 Mo. 17, decided in
1848.  [Counsel then commented on these cases.]_ It
would seem that the principles established in 37 Barb., 1
Doug. and 5 Cush., go far to govern the present case.
If the second carrier must ascertain whether the first
carrier's freight has been paid or not (37 Barb.); if he
is bound to know whether the first is deviating from the
shipper's instructions as to route (1 Doug. and 5 Cush.),
why is he not bound, also, to inquire whether the first
took the goods upon some special agreement which
would reduce his demand for carriage below the regular
rates?   If the second carrier, upon advancing back.
charges, *becomes the agent of the first*, for collecting
them, upon what principle can we· discriminate between
a case where the first has received half his freight-money
in advance, and one where he has agreed to carry for
half his regular rates?   The difficulty to the second
carrier of ascertaining the facts is le·s, perhaps, than
might be imagined.   The bill of lading always shows
whether the freight has been paid' in full or in part,
and the rate of freight, if any has been agreed upon.
Bouvier's Dic., title "Bill of Lading."   A carrier is
not obliged to pay back charges, and may protect him-
self by requiring that the bill of lading should accom-
pany the goods.   If the shipper should take a bill of
lading which did not disclose the fact of prepayment, or
of a special agreement as to rate of freight, he might not
complain of a loss to which his own folly had ·contributed.
37 Barb. *supra*.

The following opinion was filed at the June term,
1869:

PAINE, J.   There can be no doubt that the contract·
between the plaintiff and the Pittsburg, Fort Wayne
and Chicago Railway Company was not what is called a

through contract. That company did not undertake to carry the goods to Hudson; on the contrary, it expressly restricted its liability as a carrier to its own route. It did, however, guaranty, on its behalf, and in behalf of the other companies and carriers constituting the entire route, that the through freight should not exceed a certain sum. But it is a stipulated fact in the case, that each of the companies acted independently, and that they did not form a continuous line, interested together in the transportation over the whole route. It is clear, therefore, that each of the succeeding carriers, after the first, had the right to charge its usual rates, without regard to the guaranty of the first company, even if this had been known. This is not disputed. But the respondent's counsel very ingeniously and forcibly urges, that, although this was so, yet, when the succeeding companies decided to charge their usual rates, that diminished, by the amount of the excess over the guarantied rate thereby caused, the sum which the first company were entitled to; and that, therefore, the Chicago and Northwestern Company ought to have deducted the amount of such excess from the back charges which it paid to the Pittsburg, Fort Wayne and Chicago Company; and that it could not, by improperly paying over that amount to the first company, acquire any lien on the property as against the plaintiff for that sum, nor transmit any such lien to the succeeding carrier, who might receive it, paying also the same sum as a part of the back charges.

If the guaranty of the first company had been known to the others, the question would have been more difficult. But it is not entirely clear to my mind that even then the position of the respondent's counsel would have been correct. If it could be assumed that the Chicago and Northwestern Company, which received the property from the first company, could have known or readily ascertained the exact amount which the first company might ultimately be entitled to, after comply-

ing with its guaranty, there would be more force in the argument; but this could scarcely be assumed.   There were several succeeding carriers after the Chicago and Northwestern.   It might not have known what their usual rates would be.   If it had known this, it might not know whether they would all charge their usual rates, or whether some of them might choose to conform to the rate guarantied by the first company.   It would seem impossible, therefore, for it to be able to adjust the controversy between the plaintiff and the first company, that might arise on the guaranty.   Yet it would be evident on the face of the contract that the plaintiff desired the property to be transported, and that he contemplated the employment of the succeeding carriers on the route for that purpose.   This the Chicago and Northwestern company would have had the right to assume, even if it had known the exact terms of the contract. It would also have had the right to assume that the plaintiff knew the general custom among carriers so situated, of receiving goods from each other and paying the back charges.   And under such circumstances it seems to me extremely questionable whether it would not be reasonable to say that the second carrier would have the right to receive the goods, paying the back charges demanded by the first, as though its guaranty was to be complied with by the other companies, leaving the plaintiff to resort to his contract to recover whatever he might be entitled to, when the fact should be ultimately ascertained.   But as this question is not presented, I will not pursue it further.   It is conceded here that the other companies, after the first, had no knowledge of the contract between the first and the plaintiff.   Upon these facts, it seems to me clear that the carriers who have acted in accordance with the usual general custom, which the plaintiff is presumed to have known, and probably did well know, in fact, ought to have their lien for the ordinary back charges paid by them.   It would be unreasonable, where nothing accompanies the goods to

notify them of the fact, to require them to ascertain at their peril whether there are any secret stipulations between the owner and some prior carrier from whom they have been received, which may ultimately prevent him from being entitled to the ordinary rates. It is not like the case of goods being delivered to a carrier by a person having no authority to deliver them, and then the carrier claiming a lien for his charges as against the true owner. Some cases have held that there the carrier has no lien, because the owner's title cannot be thus divested or incumbered. It is not a case where the goods have been diverted from their true destination; on the contrary, the goods have been transported over the whole route, exactly in accordance with the authority and intention of the owner. It is a mere question, where the owner has taken a guaranty from the first carrier that the through rate shall not exceed a certain sum, whether the others, having no knowledge of it, are not entitled to act upon the general custom. It seems to me that they are, and that it is more reasonable to impose on the owner, who, knowing the custom, causes the goods to be delivered to the carriers, without notifying them of his secret contract, the burden of resorting to the company with which he contracted, than to impose on the carriers the burden of ascertaining at their peril all the secret agreements between the shipper and prior carriers from whom the goods are received, affecting their right to receive the ordinary freights.

The custom under which these carriers acted is more for convenience of shippers than of the carriers. It enables property to be transported over long routes, composed of many distinct companies and lines, with great safety and dispatch, and without the necessity of employing any intermediate agents other than the carriers themselves. If, therefore, the risk is to be imposed on each, to ascertain at its peril whether there are any secret agreements affecting the liability of goods received in the ordinary course of business to the ordinary freights,

this liability must result in breaking up the custom, and thus tend greatly to the public inconvenience. Upon the facts found, the defendants were entitled to their lien for the back charges.

The judgment should be reversed, and the cause remanded with directions to enter judgment for the defendants.

*By the Court.* — So ordered.

On a motion for a rehearing, the plaintiff's counsel argued substantially as follows: 1. Had the subsequent carriers a right to charge their *regular rates*, notwithstanding the agreement of the first carrier? It is pretty clear that if the Pittsburg, Fort Wayne and Chicago Company had made a "through" ·contract, *i. e.*, had undertaken for the carriage of the goods to Hudson, the subsequent carriers would have been regarded in law as acting in subordination to that contract, without proof that they had any actual knowledge of it. See 52 Barb. and cases there cited. And this seems to have been the opinion of WOODRUFF, C. J., in *Mallory v. Burrell*, 1 E. D. Smith, 234. We do not see clearly how subsequent carriers are chargeable in *law* with notice that the first carrier had made such a *through* contract, although they are in *fact* ignorant of it, and yet are not chargeable with notice that he had made a contract limiting the through rate of freight. It is said that, in case of a *through* contract, the subsequent carriers are the servants of the first, and are *therefore* in subordination to his contract; but if this is so, it would seem that they must distinguish, at their peril, between the *actual* and the *apparent* authority of the first carrier. The first has, in such a case, an apparent though not an actual authority to ·employ subsequent carriers on behalf of the owner of the goods. So the first carrier of the goods directed to be forwarded by a particular route has an *apparent* but not a *real* authority to forward them by a

different one.  So the first carrier who has received his freight in advance has an apparent but not an actual right to receive his freight again from the next carrier. And in this case the first carrier had an apparent but not an actual authority to forward the goods without any limitation as to rates of freight.  *  *  *  Where goods are delivered by the owner to a carrier, marked for a place beyond the terminus of his route, it would seem that the rights of the subsequent carrier must be determined upon one or the other of the two principles : either (1.) That the possession of goods by a carrier is notice that they are not his own, but have been intrusted to him for a special purpose, which makes him, as it were, a trustee for the owner, so as to charge a subsequent carrier with the duty of inquiring into the authority which the first carrier has in the premises ; or, (2.) That a subsequent carrier may rely upon the apparent (or implied) authority of the first to forward the goods by *any* connecting line, and to exact his own back charges, and to bind the owner for the regular rates of freight, although the owner has in *fact* directed the forwarding of the goods by a different line, or has paid the first carrier's freight in advance, or has agreed with him for a special *through* rate.  The cases referred to in our original brief, in Michigan and Massachusetts, and in 37 Barb. 230, seem clearly to be at variance with the second proposition ; those in Tennessee and Missouri, and perhaps the opinions in 1 E. D. Smith, are at variance with the first.  2.  Can a subsequent carrier pay to the preceding one a *greater* sum than he was by his contract entitled to, and acquire a lien for the *excess* so paid ?  Such a right cannot be based upon the *custom* referred to in the evidence.  By that the lien of the carrier is simply transferred, but it is not *enlarged* so as to give the subsequent carrier a right to demand more than the owner was bound to pay to the carrier from whom the lien was derived.  It is an impeachment of the general honesty of the persons engaged in the carrying

business, to assume that the receipt of *overcharges* by prior carriers from subsequent ones has become so universal and long continued as to have become a custom. In the case in 1 E. D. Smith, INGRAHAM, J., held that the *third* carrier of goods which had been damaged somewhere on the route could not recover the *back charges* paid by him to the second carrier, without showing that the damage was done to the goods *before* they came into the second carrier's hands. In the case cited from 37 Barb., the court holds that the subsequent carrier, who pays back charges, becomes the *agent of the preceding carrier* for their collection. If so, his rights cannot exceed those of his principal. It is said that the second carrier in this case did not know that the first carrier had agreed upon a special rate of through freight; that if this had been known the second carrier could not tell that the sum demanded by the first carrier, when added to the regular rates of the other carriers, would exceed the rate agreed upon. But it was under no obligation to pay the first carrier's charges, and unless it could ascertain how much to pay, ought not to have paid any thing. A refusal to pay them would not have hindered the transmission of the goods, provided all the carriers after the first could retain a lien for their regular rates. The lien of the first carrier would have passed with the goods to the ultimate carrier, and the owner would then have had an undoubted right to his goods upon tender of the charges of all the carriers after the first, and so much in addition as would have made up the contract rate. The second carrier should understand that, as in all other cases of voluntary payment, he acts at his peril, and if he pays what is not due, must look to the party who deceived him. See remarks of WOODRUFF, J., in 1 E. D. Smith, p. 241. If this is not the law, then special rates, which are now nearly universal at all great shipping points, are only snares for the credulous, and shippers are delivered over to the tender mercies of the carrying companies.

*H. C. Baker* (with *C. K. Davis*, of counsel), for the defendants, insisted, among other things, that it was apparent from the language of the special contract with the Pittsburg, Fort Wayne and Chicago Railway Co., that the parties thereto contemplated the possibility that the rates charged by the other companies might bring the total amount of charges above the rate stipulated in that contract, and for that very reason the said company bound itself by the guaranty there given ; a guaranty which could not bind the persons whom the contract itself contemplates as having lawful power to do the thing indemnified against, and who were not parties to the contract, and had no knowledge of it.

PAINE, J. The question involved in this case is one of much interest to carriers, and of still more to shippers. And for that reason, doubtless, the decision already made provoked criticism through the press from several legal gentlemen in different parts of the state. And, on a motion for rehearing, we have been furnished, not only with the able arguments of counsel engaged in the case, but also with such further light as may be derived from the discussions of those gentlemen who so kindly volunteered to aid in the solution of questions of public interest. We have also had an opportunity to inspect an elaborate brief on the same subject by a lawyer of New York. But a very attentive reëxamination of the subject has only confirmed our conviction of the correctness of the decision already announced. Still, as the question is one of intrinsic importance, and one on which there seem to be few direct authorities, perhaps it is due to those interested that we should attempt some further answer to the objections that have been urged against our conclusion.

We shall not attempt to answer any criticism founded upon the assumption that the successive carriers on the route, after the first, had notice of the special guaranty made by the first, in respect to the amount of the

through freight. It was stipulated on the trial of the case, that each of said succeeding carriers "*had no knowledge whatever*" of that agreement. It was so found by the court below. And although this may not prevent legal critics from assuming that the contract itself was actually sent with the goods, and that each of the carriers had full notice of its provisions, yet this court cannot, upon such a stipulation and finding, feel at liberty to indulge in such an assumption.

The first question which perhaps deserves some further attention is, whether the contract between the shipper and the first carrier was a *through* contract. That it was not, seemed so plain upon the face of the contract itself, that in the opinion already filed it was deemed necessary only to refer to its explicit provisions. But, notwithstanding the promise of the company was only to transport over its line, to its freight station at Chicago, and deliver to the owner or consignee, or, if to be forwarded beyond its line, to such company whose line might be considered part of the route to the place of destination; notwithstanding it expressly declared that it was distinctly understood that its responsibility as a common carrier should cease at the station where the goods were delivered to such person or carrier; it is still strenuously insisted, particularly in the brief of the New York lawyer above referred to, that, by the true construction of such a contract, the first carrier undertook to deliver the goods at Hudson, their ultimate place of destination !

The English courts have gone great lengths in imposing upon carriers, who receive goods marked for transportation to some point beyond their own route, a contract to carry them to such point. And the brief referred to relied mostly upon English decisions. The case most nearly like the present, in which they have held that rule, was that of *Collins v. B. and E. Railway*, 5 Hurl. and Nor. 969, in which the House of Lords reversed the judgment of the Exchequer Chamber

There were, however, special facts in that case, and peculiar provisions in the shipping contract, on which the decision turned, that do not exist here. It assumed that if the contract had been clear that the first company was to carry only over its own line, then it would only have had that effect. This was, in fact, clear enough in that contract; and the true law of the case is evidently to be found in the opinions of the majority of the judges, who held it to be not a through contract. But they were outnumbered by the venerable chancellors and the law lords, who, with "considerable doubt," and "not without some hesitation," acquiesced in the views of their "learned and noble friends !"

But the American courts have steadily adhered to a different rule, and have construed the contracts of carriers, arising from the reception of goods in the ordinary manner, marked for some place beyond their own routes, to be only to carry over their own routes and deliver to the carrier next in order. It is true, they have generally sustained the power of railroad companies as carriers to bind themselves by contract to carry and deliver goods beyond their own termini ; though the supreme court of Connecticut has, in several recent decisions, reëxamined that question, and denied such power altogether, upon the ground that such contracts would be beyond the scope of the charters of such corporations. But the courts that uphold the power have manifested no disposition to impose such contracts upon the carrier by construction, and require that, before he shall be held so bound, it shall appear that he intended to make such a contract.

But whatever room there might be to contend for the application of the English rule to a case where the carrier merely receives articles marked for some point beyond his own route, without expressly undertaking to carry to that point, or expressly refusing so to undertake, still, when, to remove all doubt on the subject, he expressly declares in his contract that he will not under-

take to carry beyond his own terminus, for any court to hold that, nevertheless, he does so contract, seems to be nothing less than a judicial outrage, not only on the principles of construction, but on the right of parties to contract for themselves. But of course such a position would not be taken without some pretext on which to base it. That pretext is found in the fact that the first carrier guarantied, on its own part, and on the part of the other companies, that the through freight should not exceed a certain rate. It is obvious that this stipulation, construed according to its terms, not only fails to support, but plainly refutes, the theory of a through contract. If the first carrier contracted to carry to Hudson at a certain rate, it would seem wholly superfluous, if not absurd, for it to guaranty that the freight should not exceed that rate. The word "guaranty" plainly imports that the parties contemplated that the successive carriers on the route were at liberty to act, each for itself, and wholly independent of the others. This is clearly perceived, if the word "guaranty" is to have its appropriate legal meaning. Hence, it is contended that it was not used in its technical sense; it is said that it could not have been so used, because the first carrier guarantied "on its own part," as well as on the part of the other companies.

But this is altogether too technical in an argument against technicality. It is true that it would not be technically appropriate to say that a man guarantied his own agreement. A guaranty is collateral, and relates to some contract in which some one else is principal. But where, as in this case, the stipulation relates to the entire freight over several distinct and independent lines, it is, as to all beyond the first carrier's own charges, in the strictest and most technical sense, a guaranty. And this being so, it was not only natural, but strictly and technically proper, to use the word "guaranty," although the charges of the first carrier were included in the subject-matter. That circumstance is wholly insufficient to

raise any inference whatever that the word was not used in its strict legal sense. But were there any room for doubt on the face of this provision alone, when it is seen that, in other parts of the same contract, the first carrier has expressly limited its own contract as carrier to its own line, it becomes irresistibly clear that the word "guaranty" was designed to have its strict technical and legal meaning.

It appeared from the New York brief, that the judge before whom that case was tried took the same view of the effect of this stipulation that we have taken. But it was appealed to the general term; and how it was there decided we are not advised. But it would take a great number of authorities to have weight enough to transform a contract, by which a carrier expressly refused to carry beyond his own line, into a contract to carry beyond it, by the mere force of a separate provision, which necessarily implied on its face that his undertaking as carrier extended only to his own route. In the case of *D. & M. R. R. Co. v. The F. & M. Bank*, 20 Wis. 122, the language of the bill of lading furnished much stronger ground for holding it a through contract than is furnished in this case. The receipt stated that the property was to be "*sent by the Detroit & Milwaukee Railway Company through to New York, at* $1.95 *per barrel.*" Yet, because it said, also, "under the conditions stated on the other side," and one of these expressly limited the liability of the company as carrier to its own route, it was held not to be a through contract.

And, since the former argument, we have found some other cases that throw light upon the subject. In *Darling v. B. & W. R. R. Co.*, 11 Allen, 295, the court construed a contract substantially like this one, and almost in the same words. The question there, however, did not relate to the right of the last carrier to collect all the charges that had accumulated on the goods, and which had been paid by it in the usual manner.

The consignees, in that case, had paid these, and then brought an action against the last carrier for damages to the goods which had accrued before they reached its line. The court, speaking of the contract, said: "This contract does not attempt to bind other carriers, except so far as it guaranties the rate of freight. But the guaranty itself is a contract of the Michigan Central R. R. Co. with the consignor, and all the stipulations are so framed as to exclude the idea of joint responsibility with other carriers." They said further: "The defendants collected the whole expense of the plaintiff, *because they had advanced the portion that was due to the other carriers when they took the goods.* They were not parties to the contract beyond Albany, and, upon the principles above stated, they are not liable for the default of any of the parties to those contracts."

The defendant in that case, in paying the back charges, had evidently paid those of the carrier responsible for the damage. And, although their right to collect them of the consignees was not in question, yet the court, in saying that they did "collect the whole expense, because they had advanced the portion due the other carriers when they took the goods," very strongly implied that they had a right so to collect them, without having been bound to inquire into any question of deduction on account of damage arising between the owner and prior carriers. But, although the case cannot be considered an authority upon this particular point, yet, on the general question whether such a contract as the present is a through contract, it is a direct adjudication in the negative.

So, also, in *McMillan et al. v. The M. S. & N. I. R. R. Co.*, 16 Mich. 79, the remarks of the court, in commenting on certain bills of lading given by an Ohio railroad company, have some bearing on the question. Those were not like the one given here. They undertook to deliver the goods "at Toledo for Detroit." There was no guaranty as to the through freight, though the court

did not consider it clear, upon the face of the contract, whether the freight specified was intended for the whole route to Detroit, or only to Toledo. But, in considering its effect, they say, on page 121: "It does not even appear that the charges agreed upon were for the whole route; *and if they were, the case, I think, would not be affected by that circumstance.* The only consequence would be, to make the whole freight payable to the defendants, who would deduct their own charges and pay over to the Ohio company what remained. Fixing upon the price would only amount to an agreement by the Ohio company that the whole charges should not exceed that sum. In the absence of agreement between the two companies, *the defendants would not be compelled to conform their own rates to those agreed upon at Cincinnati.*" Upon some of the questions in that case the court were equally divided. But the judges all agreed upon the construction placed upon these bills of lading. So that the opinion was unanimous, that where the first carrier contracts to carry only over his own line, even though he guaranties that the through freight shall not exceed a certain sum, the subsequent carriers are not bound by this, but may charge their own rates, and have all the rights, and are subject to all the obligations, of independent carriers; though it was also held, that if they should receive and carry them with notice of the agreed rate, this would doubtless amount to an assent to it on their part.

We have thus attempted to show that this cannot be regarded as a through contract, for the reason that, if it were, the relations between the shipper and the carriers subsequent to the first do not seem so well settled as in the other case. The English courts seem to hold that the subsequent carriers are merely the agents and subcontractors of the first, and that there is no privity of contract between them and the shipper. There are cases in this country which hold, that although they are agents of the first carrier, yet there is also a privity

of contract between them and the shipper, and that he may hold either of them directly responsible for its own actual default. Such a rule seems an attempt to blend two opposite theories together, and allow the shipper the benefit of both.

But, notwithstanding any uncertainties that might exist on this point, we do not think that, even if this were conceded to be a through contract, it should, upon the facts in this case, alter the result. It might not in that event be so well settled, that in forwarding the goods by the succeeding carriers, the first acted as the mere forwarding agent of the shipper. But whether that could be said or not, we still think it must be held that the goods came to their possession and were carried by them under his authority, and that, in the absence of any negligence on their part in obtaining proper information, they were entitled to act upon the general usage and custom of the business, and acquired all the rights as against him which they would ordinarily have under that usage. We hold this, because the shipper, knowing the custom, has caused his goods to be delivered to them for transportation, subject to back charges, without informing them, or causing them to be informed, that such back charges were different from the usual rates. If he has done this, and either he or they must suffer a loss by reason of their paying the usual rates, he ought to suffer it, and not they.

We distinguish the case from that of *Travis v. Thompson*, 37 Barb. 236, cited by the respondent, upon the ground that that decision rested upon negligence imputed to the succeeding carrier, in not ascertaining that a part of the freight had been prepaid. The opinion of HOGEBOOM, J., plainly intimates, that if the plaintiff had consulted the bill of lading, and found there no mention of the prepayment, he would have had a lien for the entire back charges he had paid according to the usual custom. GOULD, J., expressly said so. But because it did not appear that there was no bill of lading

with the goods, showing the prepayment, they assumed that if the plaintiff had consulted the bill, he would have ascertained the fact, and was therefore guilty of negligence. But in this case we are not entitled to impute any negligence to any of the succeeding carriers in not ascertaining the special rate guarantied. It is true, there was no direct evidence as to whether there was any bill of lading showing that rate or not. But the parties saw fit to remove that question from the case, by stipulating directly that none of them "had any knowledge whatever of that agreement." Clearly, upon such a stipulation, we are not entitled to assume that they were guilty of any negligence in failing to have such knowledge. We consider that case, therefore, as entirely in harmony with our conclusions.

There are certain general propositions in the opinion of Justice HOGEBOOM worthy of special attention. The contract in that case was made with Clemons, Jones & Co., to transport lumber from Montreal to Troy. It was a through contract. The plaintiff was an independent carrier over a part of the route, that between Whitehall and Troy. On receiving the lumber from Clemons, Jones & Co., he paid the entire back charges, including $100 that had been prepaid. On the general relations between the parties to such a contract, Justice HOGE-BOOM said: "3. Clemons, Jones & Co., by virtue of the contract, of course went into the possession of the goods, and had lawful possession with the consent of the owner. 4. This circumstance invested them with an apparent authority over the goods, probably sufficiently so to authorize them to employ another carrier to forward the goods to the place of destination, and to vest the latter with a lien thereon, for the price of transportation, if such was the custom and course of business. 5. The plaintiffs, therefore, came into possession of the lumber under a lawful authority, and had a right to transport the same to Troy, and, I am inclined to think, so far as their own labor and services were concerned,

to charge the ordinary rate of transportation for such labor and services, and to assert a lien therefor. '' Further on in the opinion he adds : " As to the freight earned by themselves, it may be they were independent freighters, and entitled to enforce their lien against the goods, even though the whole freight had been prepaid at Montreal.''

' These general propositions are entirely in harmony with our views as to the relations between the parties to a through contract, and the independent carriers whose employment in its execution they both contemplate. It is this that broadly distinguishes such a case from all those where the goods are delivered to the carrier, without the owner's consent, by a wrong-doer. In the one case, the owner never consents to the delivery of the goods to the carrier ; in the other, he not only consents to it, but actually contracts that it shall be done.

This also takes the case out of the reasoning of Justice WOODRUFF in *Mallory v. Burrett,* 1 E. D. Smith, 234, which is cited and strongly relied on by the respondent's counsel. In that case the through contract was made with a transportation line, which held itself out as a carrier for the entire distance between Cincinnati and New York. · It was like the case of a contract with an express company. Justice WOODRUFF placed his conclusion upon the ground that, in such cases, there is a personal confidence, and the carrier contracted with has no right to deliver the property to other independent carriers for transportation ; and that, if he wrongfully does so, the others act wholly in subordination to the contract. But in one part of his opinion he considers the question we have before us. And he so clearly states our views, that we feel justified in quoting at some length. Commencing on page 242, he says : " But where the carrier employed is confined within certain limits, and according to the course of his particular business carries only within such limits, and forwards thence by other lines, it may be said with much

plausibility, if not with truth, that one who intrusts goods to him which are marked and destined to a point beyond, authorizes him so to forward the goods ; *and that third persons are not bound to look beyond the mere fact of such possession.* As if a line, running only from New York to Boston, but in the habit of forwarding thence to places beyond Boston, be intrusted with goods addressed to Portland, Maine, *carriers from Boston to Portland may rightfully presume, from the usual course of the business of such line, and the fact of possession, an authority so to forward upon the usual and customary terms.* This is in analogy to the ordinary rule in regard to agents engaged in a particular trade or business, and employed by a principal to do certain acts for him in the course of that business ; in which case he will have power to bind the principal by all contracts which are within the scope of his ordinary employment, whether he had special private instructions. or not. Having been enabled to hold himself out to others as possessing a certain authority, the principal will be bound by its exercise, whatever may have been the actual terms of the employment itself. 22 Wend. 348–361 ; 23 id. 22 and 280 ; 3 id. 83 ; 1 Hill, 501 ; 3 id. 279 ; 5 id. 101.''

'' Had it appeared, in the present case, that the Cincinnati line, with whom the contract in this case was made, were carriers from Cincinnati to Buffalo only, and forwarders from thence to New York ; that this was their usual course of business, and this fact was known to the party forwarding the goods, or so notorious that he must be presumed to have known it, I should be much inclined to hold that, by intrusting the goods to such line, *he subjected them to the inferences justly drawn from the course of the carrier's ordinary employment, and that other carriers had a right to act upon the apparent authority thus conferred.*''

In this extract the learned judge has stated the very case here presented. The contract here was with the

Pittsburg, Fort Wayne and Chicago Railway Company. It is not necessary to say that its name indicates its termini. It is not necessary to say that the termini of railways are matters of general and public notoriety. It is not necessary to say that their charters are public laws, authorizing their construction and operation between given points, and that, therefore, any person contracting with a railway company to carry goods beyond its termini, necessarily contemplates the employment by it of other carriers to that extent. All this appears explicitly on the face of this contract itself. For even though it should be tortured into a contract to carry to Hudson, it nevertheless states that the limits of the railway were at Chicago, and that the goods were to be carried beyond that point through the agency of such other carriers, "whose line may be considered a part of the route to the place of destination." So that we have here not only all the conditions suggested by Judge WOODRUFF, but more. The shipper actually contracted for the employment of the other carriers beyond the terminus of the first company. So we have Judge WOODRUFF's authority, that these subsequent carriers had a right to assume, unless informed to the contrary, that the Pittsburg, Fort Wayne and Chicago Company had "the authority to forward upon the usual and customary terms."

What were these? They were that each successive carrier was to pay all back charges according to the usual and customary rates. If, therefore, the first carrier does forward them upon those terms, the shipper is bound, so far as the rights of the succeeding carriers are concerned. They being guilty of no negligence, there seems no sufficient reason for any distinction between their right to a lien for their own freight, and their right to a lien for the back charges which they have paid according to such usual custom. If they could hold the goods for their own freight, although the entire freight had been prepaid to the first carrier, they ought, by the

same reasoning, to hold them for the usual back charges. The reason on which the rule rests, in either case, is, that the owner has intentionally caused the goods to be delivered to them for transportation, *knowing the custom*, and not taking due care to inform them that, by reason of a special agreement, it is not applicable to his goods. From the necessity of the case, such information must come to them, if at all, from the owner or from the first carrier. The latter, therefore, even though it is a through contract, must be held to represent the owner, so as to bind him for any neglect or default in not conveying to such independent carriers, whose employment the contract contemplated, such information as is proper to charge them with notice that the particular goods are not subject to the custom. And the reason of the rule extends as well to the payment of the usual back charges as to the freight which the other carriers may themselves earn.

If, according to the usual course of the business, a bill of lading or way-bill accompanies the goods, and contains this information, of course the succeeding carriers would be chargeable with negligence if they did not inform themselves of its contents. But, as already said, upon the facts stipulated here we cannot assume such to have been the case. We hold, therefore, that even though this were a through contract, the independent carriers, whose employment was contemplated by the parties to it, receiving the goods without any knowledge of the special agreement, and not being chargeable with any negligence in not having such knowledge, were entitled to a lien, not only for their own freight according to the usual rates, but also for the usual back charges which they had paid.

But upon the theory that this was not a through contract, which is the true one, this conclusion becomes still more clear. It is then well settled, that each carrier, in employing the one succeeding him, acts as the mere forwarding agent of the shipper. *Darling v. B.*

& *W. R. R. Co.*, 11 Allen, 295–297; *N. Railroad Co. v. F. Railroad Co.*, 6 Allen, 254; Story on Bailments, §§ 502, 537. This relation being conceded, the solution of the question is very clear. Those general principles, applicable to questions of agency, stated in the extract from Judge WOODRUFF's opinion, above quoted, become then directly applicable. The goods are then delivered to each carrier by the owner's agent. Each· has the right to assume that such agent has the authority to forward the goods according to the usual course of the business. Such is his apparent authority. And if there are any private stipulations between him and his principal, modifying this authority in any respect, third parties, dealing with him on the faith of his apparent authority, without notice, are not bound by them. The fact that in such case the forwarding agent acts for himself in collecting the charges, does not show that he does not also act as agent in communicating to the carrier who receives the goods the amount of back charges to be paid by him. The payment of those charges was, under the custom, a necessary condition to the delivery of the goods to him. And it was, therefore, within the scope of the forwarding agent's authority to inform him as to the amount of such charges. And for any mistake of his in that respect, the principal and not the innocent carrier should suffer.

The case of *Fitch et al. v. Newberry,* 1 Douglas, 1, and of *Robinson v. Baker*, 5 Cush. 137, are cited to support the position that in all such cases the carrier receiving the goods takes the risk, not only of the agency of the one who delivers them, but also of his observing the exact letter of his private instructions. But while they do hold that he takes the former risk, they do not hold that he takes the latter. And there is a later case in which the supreme court of Massachusetts establishes the opposite rule, and comments on the case in the 5th of Cushing, showing that it has no application to such a question as is here presented. It was in the case of

*Briggs v. The Boston and Lowell R. R. Co.*, 6 Allen, 246. The contract there was with the Racine and Mississippi Railroad Company, to forward and deliver flour in Williamstown, Massachusetts. By mistake of its agents, it was billed to Wilmington, instead of Williamstown. The defendant carried it to Wilmington, and paid the back charges according to the usual course of the business. The court held that the shipper was responsible for the mistake of his own forwarding agent, and that the defendant had a lien, not only for its own freight, but for all the back charges. And in commenting on the case in 5th Cushing, they say that the same result would have occurred there, except for the fact that the party who misdirected the goods was not the forwarding agent of the owner at all, but had contracted to deliver them in Albany to a specific consignee.

Although this opinion is already too long, I cannot forbear quoting at some length from the opinion of the court in that case. They say : " The same person may be, and often is, not only a common carrier, but also the forwarding agent of the owner of the goods to be transported. Story on Bailments, §§ 502, 537. He must necessarily act in the latter capacity, whenever he receives goods which are to be forwarded, not only on his own line, but to some distant point beyond it on the line of the next carrier, or on that of the last of several successive carriers, on the regular and usual route and course of transportation, to which they are to be carried and there delivered to the consignee. The owner generally does not, and cannot always, accompany them, and give his personal directions to each one of the successive carriers. *He therefore necessarily, in his own absence, devolves upon the carrier to whom he delivers the goods the duty, and invests him with the authority, to give the requisite and proper directions to each successive carrier*, to whom, in due course of transportation, they shall be passed over for the purpose of being forwarded to their ultimate place of destination. Other-

wise they would never reach that place. For the first carrier can only transport the goods over his own portion of the line ; and if he is not authorized to give the carrier, with whose route his own connects, directions in reference to their further transportation, they must stop at that point; for although, in general, every carrier is bound to accept and forward all goods which are brought and tendered to him, yet he is not so bound unless he is duly and seasonably informed and advised of the place to which they are to be transported. Story on Bailments, § 532; *Judson v. Western Railroad*, 4 Allen, 520. Hence it results, by inevitable implication, that when an owner of goods delivers them to a carrier to be transported over his route, and thence over the route of a succeeding carrier, or the routes of several successive carriers, *he makes and constitutes the persons to whom he delivers them his forwarding agents*, FOR WHOSE ACTS IN THE EXECUTION OF THAT AGENCY HE IS HIMSELF RESPONSIBLE. And therefore, if the several successive carriers carry the goods according to the directions which are given by the forwarding agents, they act under the authority of the owner, and cannot in any sense be considered as wrong-doers, although they are carried to a place to which he did not intend that they should be sent. And in such case, the last carrier will be entitled to a lien upon the goods, not only for the freight earned by him on his part of the route, but also for all the freight which has been accumulating from the commencement of the carriage until he receives them, which, according to a very convenient custom, which is now fully recognized and established as a proper and legal proceeding, he has paid to the preceding carriers. "

The principle of this decision is just as applicable to a case of misdirection by the forwarding agent concerning the amount of back charges to be paid by the succeeding carrier, as to a misdirection concerning the destination of the goods. Information on both subjects is within the scope of his agency, and therefore the prin-

cipal must be responsible for his mistakes or defaults in respect to either.

*By the Court.*—The motion for a rehearing is denied.