GOODIN & GOODIN *v.* SOUTHERN RAILWAY COMPANY.

1. Allegations of loss of profits which would have accrued to plaintiffs upon the fulfilment of a collateral contract, in consequence of the delay on the part of a common carrier in the delivery of freight, are properly stricken upon demurrer, where it does not appear that the contract, from the fulfilment of which profits would have accrued, was in the contemplation of the parties at the time the carrier received the freight for transportation.
2. Where the agent of the defendant company (a terminal carrier) at the station to which such freight is carried demands a sum as freight greater than that fixed in the bill of lading issued by the initial carrier, and, in consequence of the consignee's refusal to pay more than the

latter sum, the shipment is not delivered for a period of ten days, the last carrier is not liable in damages to the consignee on account of such delay, even though at the expiration of the time named the goods are delivered upon the payment of the amount of freight set out in the bill of lading, where it does not appear that the amount demanded by the defendant's agent was in excess of the legal and proper charges, according to the fixed and usual rates, nor that there existed between the defendant company and the initial carrier contractual relations with reference to transportation charges.

Argued October 9, 1905.—Decided May 24, 1906.

Action for damages. Before Judge Hammond. Richmond superior court. January 25, 1905.

Goodin & Goodin, sawmill operators, sued the Southern Railway Company for damages caused by delay in the delivery of certain sawmill machinery. The petition, as first amended, alleged, that the defendant "is a railroad corporation in possession of the Augusta Southern Railroad from Augusta to Sandersville, Ga., and said defendant was operating said Augusta Southern Railroad from Augusta to Sandersville, Ga., during the month of May, 1903;" that the plaintiffs purchased the machinery from a dealer in Atlanta, to be delivered at Gracewood, a station on the Augusta Southern Railroad; that the defendant received the machinery for transportation to Gracewood, and that the machinery was received at Gracewood May 9, 1903; that the plaintiffs presented the original bill of lading to the agent of the defendant on the day the shipment arrived, and also tendered to him as freight the amount therein named, but that the defendant refused to deliver the machinery until a higher freight charge was paid than the rate named in the bill of lading, claiming that the way-bill accompanying the shipment specified the higher rate; and that after a delay of some ten or twelve days, the machinery was delivered upon payment of the price named in the bill of lading. The plaintiffs alleged that by reason of the delay in the delivery of said machinery, they were unable to fulfill a contract to saw a certain amount of lumber, and they asked as damages the amount they would have made had they been able to perform the contract. To this petition the defendant filed a general demurrer, upon the ground that the only damage alleged in the petition was loss of profits growing out of a collateral contract of which the defendant had no knowledge at the time the contract of freightage was made, and that such profits are not re-

coverable in law. Before judgment was rendered on the demurrer, the plaintiffs amended their petition by setting up as additional damage the expenses connected with the maintenance of their idle plant; whereupon the defendant demurred specially to that part of the petition which sought to recover profits growing out of the collateral contract. The special demurrer was sustained and that part of the petition stricken; to which ruling the plaintiffs excepted. On the trial the plaintiffs introduced evidence supporting the allegations that the machinery was received at destination upon the date named, and that it was held for ten days on account of higher charges being demanded by the defendant than those stipulated in the bill of lading, and was finally delivered upon payment of the charges named in that contract; also testimony going to show that they were put to expense in maintaining an idle plant, caused by this delay; that the Southern Railway Company operated the Augusta Southern Railroad during the month of May, 1903, and that Gracewood was a station upon the line of the Augusta Southern. On the conclusion of the plaintiffs' evidence the court granted a nonsuit; and the plaintiffs excepted.

*F. W. Capers* and *F. L. McElmurray,* for plaintiffs

*Joseph B. & Bryan Cumming,* for defendant.

BECK, J. (After stating the facts.) 1. There can be no doubt that the judge who tried the case below was right in sustaining the demurrer to that part of the petition which sought to recover the profits of a collateral contract between the plaintiffs and a third party, it not being alleged that the defendant company had notice of such contract at the time it undertook to transport the shipment. In the case of *Wappoo Mills* v. *Commercial Guano Co., 91 Ga.* 396, this court held: "The purchaser of goods can not recover of the seller damages for non-delivery measured by his profits on a particular contract of resale and by his losses on account of inability to perform that contract, unless the seller at the time of making the contract of sale had notice of such contract of resale." See also *Cooper* v. *Young,* 22 *Ga.* 269; 2 Sedg. Dam. 630; 8 Am. & Eng. Enc. L. (2d ed.) 623, and cit.

2. It is undoubtedly the duty of a connecting carrier to deliver freight entrusted to its care, the destination of which is upon its line, within a reasonable time; and it is true that the violation of this duty gives rise to a right of action ex delicto for the dam-

ages resulting from such delay (*Johnson* v. *East Tenn. Ry. Co.,* 90 *Ga.* 810) ; yet it is equally clear that where such carrier receives the goods at the end of another carrier's line (there being no contractual relations between the two roads with reference to transportation charges), and the latter neglects to inform the former of a special rate agreed upon in its contract of shipment with the consignor, but delivers to the connecting carrier a way-bill calling for a different and higher rate than the charge named in the bill of lading issued to the consignor, the connecting carrier has the right to demand the charges named in the way-bill before delivering the shipment to the consignee, where it does not appear that the amount specified in the way-bill is not the usual rate. Such are the facts in this case. It is inferable from the record that the shipment was delivered to the Central of Georgia Railway Company at Atlanta, that that company issued to the consignor a bill of lading wherein it agreed that the shipment would be transported to the destination at a specified rate, and that it then transported and delivered the shipment, together with the way-bill calling for the higher rate, to the defendant at the junction point of the two companies. Under these circumstances the defendant had the right to demand the rate named in the way-bill, there being neither allegation nor proof that there existed between the two companies contractual relations in regard to freight charges. And this position is amply supported. "Plaintiff made a contract with a railroad company for special through rates on a shipment of five mares. On the arrival at their destination on another line of railroad, plaintiff tendered the amount fixed by the contract and demanded delivery, which was refused unless a larger sum called for by the way-bill was paid. Plaintiff then brought action against this railroad company for the recovery of the mares. *Held,* that plaintiff having introduced no testimony to show that the initial road was authorized to make such special contract for the defendant, a nonsuit was properly granted." Lewis v. R. Co., 25 S. C. 249. See, to the same effect, Wells v. Thomas, 27 Mo. 17 (72 Am. Dec. 288) ; Mt. Pleasant Mfg. Co. v. R. Co., 106 N. C. 207 (10 S. E. 1046) ; Schneider v. Evans, 25 Wis. 241.

The shipment in the case at bar was made under a "standard bill of lading," which contained recitals to the effect that the goods were shipped "released" and at a reduced rate, and that the initial

carrier should not be held liable beyond its own line. "Where the first of several connecting railway companies, while stipulating against liability beyond its own line, makes a guaranty that the cost of transportation to a distant point beyond its own route shall not exceed a certain sum less than the usual aggregate of charges, and this without any knowledge or notice of the guaranty by any of the connecting roads, and without their authority to give it, each succeeding company after the first may charge and pay preceding charges at the usual rates; and the last carrier or the final warehouseman will have a lien on the goods for the total amount accordingly; for the shipper's remedy is against the first carrier on the guaranty." Schoul. Bail. & Car. § 610, p. 630. See also Hutch. Car. § 478 a. But now the question is suggested, did the defendant company, by accepting the shipment, become bound by the terms of the special contract notwithstanding the fact that it was not a privy or party to the contract, and was, in fact, informed by the initial carrier, by means of the way-bill, that a rate different from the amount stipulated in the contract had been charged? In the absence of an allegation that a copy of the bill of lading accompanied the shipment, or that the defendant had notice of its terms, or that the amount specified in the way-bill was on its face an unusual and excessive charge, we think not. It is generally recognized in cases similar to this that the initial carrier is the agent, not of the succeeding carrier, but of the shipper (*Ga. R. Co.* v. *Murrah,* 85 *Ga.* 347) ; and where the initial road, acting in the scope of such agency, fails to inform the connecting carrier of a special contract of shipment, made with it by the consignor, but leads the succeeding road to believe that the shipment is to be transported in consideration of the usual rate, we are constrained to believe that the connecting carrier is entitled to the usual rate and is not bound by any secret agreement between the shipper and the first carrier. Although this question was not clearly made in the case of Schneider *v.* Evans, supra, both parties there having agreed that the connecting carrier "had no knowledge whatever" of the contract made with the initial carrier, yet the language of the judge who delivered the opinion in that case is pertinent here and applicable to the point now raised. He said (p. 251) : "It is a mere question, where the owner has taken a guaranty from the first carrier that the through rate shall not exceed a certain sum, whether

the others, having no knowledge of it, are not entitled to act upon
the general custom.   It seems to me that they are, and that it is
more reasonable to impose on the owner, who, knowing the custom
[of carriers, of paying back charges and charging the usual rates
for transportation], causes the goods to be delivered to the car-
riers, without notifying them of his secret contract, the burden of
resorting to the company with which he contracted, than to impose
on the carriers the burden of ascertaining at their peril all the
secret agreements between the shipper and prior carriers from
whom the goods are received, affecting their right to receive the
ordinary freights."   And again: "The custom under which these
carriers acted is more for convenience of shippers than of carriers.
It enables property to be transported over long routes, composed
of many distinct companies and lines, with great safety and dis-
patch, and without the necessity of employing any intermediate
agents other than the carriers themselves.   If, therefore, the risk
is to be imposed on each, to ascertain at its peril whether there are
any secret agreements affecting the liability of goods received in
the ordinary course of business to the ordinary freights, this lia-
bility must result in breaking up the custom, and thus tend greatly
to the public inconvenience."   Nor is this principle new to our
court, it being clearly recognized in the *Murrah* case, supra, where
it was said: "That the charges, if within the ordinary rates, and
apparently regular, are not cut down, nor the right to hold the
goods defeated, by the mistake or omission of a previous independ-
ent carrier, of which the last carrier, without fault or negligence
on his part, has no notice, see" numerous cases and text-writers,
among them being the case of Wells v. Thomas, supra.   And in the
case last cited (Wells v. Thomas) there was a bill of lading issued,
naming a certain fixed rate for the through transportation, as in
the case at bar; and, as was also done in the case under considera-
tion, the amount stipulated in the bill of lading in the Wells case
was tendered to the terminal carrier; but the court there did not
hesitate to say: "What may be the proper construction of the bill
of lading forwarded to the plaintiffs here by the New York Central
Railroad Company is not material to be determined.   If the mean-
ing of it be as intended by the plaintiffs, the New York Company
is of course responsible; but this is no reason why defendants should
lose their lien.   If any arrangement or understanding existed

among these corporations relative to through transportation, the rule would be different." Thus clearly showing that the contract with the initial carrier, to which the defendant was not a privy or party, had no possible bearing on the case. So it would seem clear that had the defendant company in the present case held the shipment until the amount named in the way-bill, or usual rate, was paid, the plaintiffs below would have had no right of action against it (there being no proof of any contractual relation existing between the two carriers), our own court having held that where there is no arrangement whereby two or more carriers are connected as common or joint contractors in the business of transportation, each conducting its business separately and independently of the other, neither has implied authority from the other to make contracts in its behalf as to the charges which will be made for the transportation of goods. *Ga. R. Co.* v. *Murrah,* supra. And this holding—that the mere acceptance of a shipment by a succeeding carrier is not an undertaking on its part to carry out the terms of a contract of shipment of which it has no knowledge, made between the consignor and initial carrier, when it is informed by the initial carrier that the shipment was made under the usual conditions—is not a death blow to all "through contracts" of shipment, as may be contended. When the shipper chooses an initial carrier as his agent to see that goods reach their destination, and makes a binding contract with such carrier under the terms of which it agrees to guaranty the rate for the whole distance, a portion of which is beyond the carrier's line, he is not without his remedy if a succeeding carrier, without knowledge of this contract, accepts the shipment and charges a higher rate. "If the first carrier has contracted for the rate for the entire transportation, and the charges exacted by connecting carriers are such as to render the entire charge greater than that contracted for, the remedy of the consignor or owner is against the carrier with whom the contract was made." 6 Cyc. 495. "The plaintiff cannot, therefore, in the absence of some agreement by the defendant to refund, recover of it the sum paid in excess of what the [initial carrier] agreed to ship the goods for, the remedy being to sue the [initial carrier] on the contract." Mt. Pleasant Mfg. Co. *v.* R. Co., supra. See also Railway Co. *v.* Daniels (Ark.) 5 S. W. 584; Schoul. Bail. & Car., supra.

The defendant company did all that could be required of it as a public carrier when it transported the shipment promptly and safely to the destination, and there offered it for delivery upon payment of the charges specified in the way-bill, there being no allegation that the defendant company did not use all proper care and diligence in ascertaining what the charges were when it accepted the shipment under the way-bill, or that those charges were not the usual and lawful charges. If the charges demanded were beyond the lawful and usual charges, it should have been so alleged and proved. The case being a suit in tort for the alleged breach of duty, the plaintiffs are of necessity required to prove the tortious act before there can be a recovery; and this they have failed to do. Under no view of the case—as we see it—has the defendant failed to do its duty. It owed no public duty to the plaintiffs to deliver the goods until it had been paid its lawful charges for transporting them. And if the defendant had the right to hold the goods until its proper charges were paid, it certainly had the right to subsequently deliver the goods for a smaller charge, unless prevented from so doing by law. Hence, it follows that the judgment granting the nonsuit was the only one that could properly have been rendered, under the facts and circumstances of this case.

*Judgment affirmed. All the Justices concur, except Fish, C. J., absent, and Atkinson, J., not presiding.*