BERGER-CRITTENDEN COMPANY and others, Respondents, vs. CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY and another, Appellants.

*October 28, 1914—January 12, 1915.*

*Carriers: Contracts: What law governs: Limiting liability: Through contracts: Refusal of connecting carrier to 'receive freight: Action, tort or contract? Delivery of freight: Embargo, when lawful.*

1. In the absence of evidence showing a contrary intent, a bill of lading issued in Illinois is governed by the law of that state as to the nature and validity of the contract, and this includes the question whether a printed clause in such bill of lading limiting the carrier's liability to its own line is binding upon the consignor.

2. Under the law of Illinois as interpreted by its courts, such a limitation is not prohibited, but to make it effective something more is required than merely delivering the freight and accepting a bill of lading with the limitation printed therein; and the same ruling will be applied here in respect to a bill of lading issued in that state.

3. In Illinois, as in this state, the English rule prevails, that the acceptance of freight consigned to a point beyond the line of the first carrier, and delivery of the usual receipt specifying the point of origin of the freight, the terminal point, the connecting line required to complete the transit, and the rate for the entire carriage, constitutes a contract for through service, rendering the initial carrier liable for default of the connecting carrier.

4. Where a railroad company, designated as connecting carrier in a contract of affreightment for a through rate, accepts the freight and demands and receives part of the through rate, and then fails to complete its part of the transit, or where it has held itself out to the public for the performance of such service, or by

general course of business has authorized the initial carrier to make the through contract, and then refuses to receive the freight from the initial carrier upon some ground inconsistent with its contractual obligations to do so, the wrong constitutes a breach of contract, and both carriers may properly be joined in an action to recover damages therefor.

5. The question whether a particular situation constitutes reasonable cause for a railroad company to refuse to receive freight of a particular kind, or from or for a particular point, may be and generally is one of law; but whether such particular situation exists or not in any given case is generally a question of fact to be decided upon evidence.

6. Mere delivery by a carrier of a carload of freight at the unloading place does not constitute delivery of the subject of transit into the possession of the consignee; the latter being entitled to reasonable time and opportunity to inspect the property and to reject it if rendered worthless or materially injured in transit. Hence, where the consignee had justifiably refused to accept property which became worthless while in transit, the fact that the cars containing such property filled its delivery track did not render it responsible for the blockade so as to warrant the carrier in refusing to accept and deliver other freight shipped to said consignee.

7. After notice of an embargo by a connecting carrier, the initial carrier may accept freight at its own risk of the embargo being actually lifted by the former, or being constructively lifted because of the reasonable basis for it no longer existing, in time for the through transit to be completed.

8. A railroad company must have reasonable ground for instituting an embargo of freight from another carrier, or it is illegal, and if legal when instituted, its continuance becomes illegal when there is no basis for it other than its own culpable negligence.

APPEALS from a judgment of the circuit court for Milwaukee county: W. J. TURNER, Circuit Judge. *Affirmed.*

Action to recover damages for breach of contract of carriage.

December 16, 1909, plaintiffs purchased, at East St. Louis, Illinois, a quantity of water-soaked alfalfa meal. It was required to be kiln dried to save it for use. To that end it was arranged to ship the stuff over the *Alton Railroad* line and that of *Chicago, Milwaukee & St. Paul Railway Company,*

the two being connecting lines, to Milwaukee, Wisconsin. The agents of both lines knew of the perishableness of the freight. The *Alton Company* received it as routed over the two lines to the desired destination, issuing an appropriate freight bill, containing a printed limitation of its liability for damages to such as might occur on its own line. Plaintiffs' attention was not specifically called thereto. They did not assent to such limitation by delivering the freight and accepting the proper contract without protest. After many cars had been started over the *Alton* line, a few of which duly reached Milwaukee, because of delay in getting cars from the connecting point in the switching district at Chicago, to Milwaukee, plaintiffs directed a diversion to Cragin, Illinois, thinking to have the property treated there instead of at Milwaukee. The nature of the material was such that pretty prompt treatment by drying was necessary to prevent its becoming worthless. Plaintiffs did not make final arrangements therefor at Cragin, Illinois, until some six days after the last of the cars aforesaid were loaded out at East St. Louis,—all of which in due time made the transit of that line. During the delay, twenty-one cars more were loaded out at East St. Louis and likewise duly made the transit of the *Alton* line. There was a bill of lading for each car of the nature aforesaid. This action has reference only to the twenty-one cars. They were routed over the *Alton Railroad* and the *Chicago, Milwaukee & St. Paul* lines, consigned to the American Malting Company at Cragin, Illinois, where plaintiffs designed to receive them. There was conflicting evidence as to the value of the freight when delivered into the care of the *Alton Company.* Prior to the time of the particular shipments cars of the first lot had been placed on the track for the consignees at Cragin, Illinois, but not before there had been considerable delay. None of them had been unloaded. There were several rail connections between the *Alton* terminal and the destination at Cragin, besides the *Mil-*

12]        JANUARY TERM, 1915.        259.

Berger-Crittenden Co. v. Chicago, M. & St. P. R. Co. 159 Wis. 256.

*waukee* line.   Plaintiffs did not know of that fact.   A rea-
sonable time for movement of freight from East St. Louis to
the termination of the transit was about five days.   The cars
in question were loaded out for the *Alton,* as follows: Janu-
ary 25, 1910, three cars, the next day four cars, the next
eight cars, the next one car, and the next five cars.   All ex-
cept one duly reached the termination of the *Alton* transit;
but were not taken over by the *Milwaukee* line until March 6,
1910.   They were transferred by the latter to the point of
consignment the next day.   Plaintiffs then refused to receive
the freight because it had become worthless in the transit.
The delay in the transfer from the *Alton* to the *Milwaukee*
line was because, January 25, 1910, the latter notified the
former that, until further notice it would not receive cars of
alfalfa meal for the American Malting Company at Cragin,
Illinois.   The reason assigned was blockade of freight.
March 2d, thereafter, and before notice of any change, the
*Alton Company* was again notified by the *Milwaukee Com-
pany* of a freight blockade as to its line, no reason being as-
signed, and acceptance of the delayed cars conditioned upon
prepayment of freight and guaranty of switching charges.
Agreeable to the second notice, the *Alton* line assumed the
switching charges and guaranteed the freight charges, pre-
viously having requested plaintiffs to assume the burden which
they refused to do upon the ground that the contract of af-
freightment entitled them to tender of the freight to the con-
signee at the place of consignment.   At the time of the first
notice, the *Milwaukee* line had on its track thirty-eight of the
first lot of cars.   January 29, 1910, plaintiffs complained to
the *Milwaukee* line of its refusal to transfer cars to the con-
signee and, four days later, received reply that it could not
remedy the situation until the consignee cleared its tracks of
cars already delivered.   Before such reply was received,
plaintiffs notified the *Milwaukee* road that they would not re-
ceive the freight held on its road, nor pay the freight charges,

nor clear the track as demanded, because the meal had become worthless in the delayed transit, and requested the company to remove the cars of worthless stuff in order that the later cars, which were still in a condition to be saved, might be set in. Later, as a result of some negotiations, plaintiff unloaded and dried some ten or more cars. There was a conflict as to whether it received the stuff as delivered according to contract, or to minimize damages for which defendants might be liable. The effort to thus save the stuff was not successful and, thereupon, the *Milwaukee Company* was notified that the twenty-one cars which had been held as aforesaid, would not be received nor the freight paid. The meal in those cars was all spoiled before this time.

All matters aforesaid were established, or there was evidence in regard to them. The theory of the plaintiffs was that the freight was received on a through bill of lading, without limit of liability; that the *Alton* line had authority to make such a contract, binding the *Milwaukee Company* thereto; that the latter unreasonably delayed the delivery, and that both companies were liable.

The trial court decided, as matter of law, that the *Milwaukee Company* was justified in declining to receive cars from the *Alton* up to the 3d or 4th of February, 1910, and submitted other matters to the jury for a special verdict, with this result: The alfalfa was worth $4 per ton when loaded out at East St. Louis. The refusal of the *Milwaukee Company* to receive the cars after February 3, 1910, was unreasonable. Before the refusal to unload, the meal became worthless. Plaintiffs were not negligent in loading out their property at East St. Louis faster than it could be duly taken care of on the track of the consignee. They were not negligent in failing to give the *Alton Company* disposition of the meal after notice of inability to make delivery to the *Milwaukee Company*, which proximately contributed to the loss. The meal in one of the cars had no value when it arrived in Chicago.

The trial court held with plaintiffs as to the limitation clause in the bills of lading being ineffective, and that, under the circumstances, it was entitled to recover of both defendants $4 per ton for the meal in twenty cars, and at the same rate of the *Alton Company* for that in the additional car.

Judgment was rendered accordingly.    The defendants separately appealed.

For the appellant *Chicago, Milwaukee & St. Paul Railway Company* there were briefs by *C. H. Van Alstine, H. J. Killilea,* and *Rodger M. Trump,* and oral argument by *Mr. Trump.*

For the appellant *Chicago & Alton Railroad Company* there were briefs by *Quarles, Spence & Quarles,* attorneys, and *I. A. Fish,* of counsel, and oral argument by *Mr. Fish* and *Mr. W. C. Quarles.*

*Lawrence A. Olwell,* for the respondents.

MARSHALL, J.    The primary question presented here is this : Did the trial court err in holding that the clause printed on each of the bills of lading, exempting the initial carrier from liability for damages not occurring on its road, was not a part of the contracts of carriage ?

The place of the contract was the state of Illinois and the law of that state governs as to the nature and validity thereof since there was no evidence showing a contrary intent.    That is elementary.    *International H. Co. v. McAdam,* 142 Wis. 114, 124 N. W. 1042.

Does the proposition stated fall within the field of validity and interpretation,—that of what the real contract between the parties was?    In answering this it does not matter, necessarily, what would be our conclusion if the place of the contract was Wisconsin, nor what it would be as an original proposition, as regards an Illinois contract.    The courts of that state have settled the law there, that without express assent to a restrictive provision, something other than merely accepting the paper and delivering the freight, as was done in

this case, such a provision does not become effective and the contract must be read as if it was no part thereof. That seems quite plain from decisions introduced in evidence and others. *Chicago & N. W. R. Co. v. Chapman,* 133 Ill. 96, 24 N. E. 417; *Chicago & A. R. Co. v. Davis,* 159 Ill. 53, 42 N. E. 382; *Wabash R. Co. v. Thomas,* 222 Ill. 337, 78 N. E. 777; *Ill. M. Co. v. C., R. I. & P. R. Co.* 250 Ill. 396, 95 N. E. 492. The written law of Illinois provides that "whenever any property is received by a common carrier, to be transported from one place to another, within or without this state, it shall not be lawful for such carrier to limit his common-law liability safely to deliver such property at the place to which the same is to be transported, by any stipulation or limitation expressed in the receipt given for such property." In administering the statute the court early held that it does not prohibit a restriction of common-law liability, but does create a disability to do so by a mere clause in the freight receipt. *Chicago & N. W. R. Co. v. Chapman,* 133 Ill. 96, 24 N. E. 417.

The subject has been reviewed in several courts and by text-writers, as indicated by the authorities cited to our attention, all holding that in Illinois the particular question falls within the field of validity and interpretation,—in short, of that of what the contract is, and not in that of performance or remedy for a breach. *Hoadley v. Northern T. Co.* 115 Mass. 304; *Hartmann v. L. & N. R. Co.* 39 Mo. App. 88; *Powers M. Co. v. Wells-Fargo & Co.* 93 Minn. 143, 100 N. W. 735; 1 Hutchinson, Carr. (3d ed.) § 208.

True, as said by the Massachusetts court in the cited case, what appertains to validity and interpretation and what to mere performance and remedy, is sometimes not easily determined. But the particular matter has been determined by the Illinois court for Illinois contracts, and was, in effect, written into those in question. Such determination has been, in general, followed in other jurisdictions, though con-

ceding that, as an original proposition, the holding might be different. It is considered that this court should do likewise. Our relations with Illinois are very intimate. Contracts of the kind in question are liable to be very numerous. As said in one of the cited cases, taking issue with the decision of the Massachusetts court, it would be exceedingly inconvenient for contracts made in a state on our borders to mean one thing on one side of the line and a different thing on another. Conceding the logic of the opinion in *Hoadley v. Northern T. Co.,* that there is room in the situation for diverse views, the better policy is to incline, as the Missouri and Minnesota courts did, to the one which obtains and has become, by statutory construction, written law in our border state. We are so inclined and affirm the decision of the court below; thus giving the same construction to the contracts of affreightment as would be given thereto at the place thereof.

The exemption provision in the contracts being out of the case, the next question is whether such contracts were for a through service, rendering the *Alton* road liable for the default of the connecting carrier.

The contract in each case was made by receiving the freight and delivering the usual freight receipt, specifying the point of origin of the freight, the terminal point beyond the line of the receiptor, the connecting line required to complete the transit, and the rate for the entire carriage. As said before, the law of Illinois must be considered as embodied therein; but that makes no difference on this point. Reference to *Schneider v. Evans,* 25 Wis. 241, which did not involve such a contract as the one before us, seems beside the case. It is otherwise as to *Peet v. C. & N. W. R. Co.* 19 Wis. 118, as regards the question before us. The latter with *Tolman v. Abbot,* 78 Wis. 192, 47 N. W. 264, and other cases in this court establish the unwritten law on the subject for this state, substantially following the English rule as to what constitutes a through contract. 4 Elliott, Railroads, § 1434. Other

courts, including that of Illinois, have followed such rule, though probably, as suggested by Judge Elliott, the majority of courts of this country have adopted what is called the American rule, which is that receipt of goods by one line, destined to a point on the line of a connecting carrier, does not of itself raise an implication of extraterminal liability and, in many jurisdictions, a through rate to the extraterminal point is not enough to change the rule. 4 Elliott, Railroads, § 1435. Illinois has not only adopted the so-called English rule, as it seems, but by statute, as judicially construed, has precluded its disturbance other than by an express contract, as is clearly shown by the cited cases.

So, regardless of what the obligation of a railroad company would be under such a contract as the one in question made in this state, by the law of Illinois the agreement was for a through transit with full common-law liability.

The point is made on behalf of the appellant *Chicago, Milwaukee & St. Paul Railway Company* that if respondents have any cause of action as to such company, it is to redress a wrong sounding in tort, which cannot be joined with proceedings to redress a breach of contract,—the wrong complained of as to the *Alton Company*. There does not seem to be merit in that proposition. It may be that, in general, a mere unreasonable failure of a connecting carrier to receive freight tendered from another road would be a breach of duty, having more the cast of a tortious wrong than a breach of contract. But, where a connecting carrier is not only in duty bound to receive goods so tendered, but holds itself out to the public for the performance of such service, and is designated by the initial carrier, in the contract of affreightment for a through rate, as the connecting line, and the latter assents thereto by force of a custom (1 Elliott, Railroads, § 303; 4 id. § 1443a), or by placing refusal to accept the freight upon some ground inconsistent with contractual obligations to do so, or by accepting it and demanding and receiving part

of the through rate and then failing to complete its part of the transit, the wrong, distinctly, sounds in breach of contract. The holding out involves an offer to receive the subject of carriage and to convey the same over its line. The tender of the freight is an acceptance of the offer. The promise for a promise makes the mutuality of a contract. The actual acceptance of the property by the carrier pursuant to the designation in the agreement with the initial carrier, makes the former a party, to all intents and purposes, to such agreement "bound by the undertaking therein and benefited by the limitations," which are valid. 4 Elliott, Railroads, § 1446 and cases cited. That is the law, in general, appertaining to a bill of lading covering a transit from the origin of the freight to a final delivery point for a through rate by a designated route, covering an initial and connecting carrier. Each line after the first which shall have, expressly, or by general course of business, authorized the initial carrier to make the contract, or which acts upon the designation in affirmance of the initial act, becomes a party thereto. *Railroad Co. v. Androscoggin Mills,* 22 Wall. 594, 601. So it seems the fault complained of as to the connecting carrier here, was of the same nature as that respecting the initial carrier.

The foregoing covers all the questions in the case except those involving matters of fact, requiring jury interference for their solution. All were duly submitted and found in respondents' favor, and the findings have believable evidence and reasonable inferences in their support.

It may be that the learned trial court did not, with consummate definiteness, instruct the jury on the subject of whether the *Milwaukee Company* unreasonably maintained an embargo against receiving the freight from the *Alton* line after February 4, 1910. But it seems that the jury must have understood from the course of the trial that the railroad company had a right to refuse to receive the freight into its possession, if conditions on the delivery track, not attributable

to its inexcusable fault, were such that it could not promptly place cars thereon and thus terminate its responsibility. No question was raised on the trial as to the right of a railroad company, for reasonable cause, to declare an embargo, as it is called, against receiving freight of a particular kind, or at all, or from or for a particular point. It must be conceded, and is as we understand it, that whether a particular situation constitutes such reasonable cause may be, and generally is, matter of law, but whether such situation existed or not, in any given case, most generally, is matter of fact to be decided upon evidence.

This case was submitted to the jury upon the theory that, if, through fault of the *Milwaukee Company,* a continued occupancy of the delivery track by cars of the first lot, leaving no room thereon for the particular cars, prevented completing the transit until the property therein became worthless, and nevertheless, it refused to make the delivery because of such occupancy, then it committed a wrong. The findings of the jury are to the effect that, from the 4th day of February, 1910, until the property in question became worthless, during which time the cars in question were at the point of transfer to the *Milwaukee Company,* the refusal of the latter to receive the freight and complete the transit was not justifiable,—not justifiable, we understand, by reference to the evidence, because the responsibility for the conditions on the delivery track was with such company. The trial court said in closing the case: "There is much testimony on the question," which is quite true, and further instructed as follows:

"You will remember, gentlemen of the jury, the testimony given by the several witnesses as to what occurred after or at about the 1st of February, and from that until the 3d or 4th day of February, 1910, with reference to the blockade which was declared, it being claimed by the *Chicago, Milwaukee & St. Paul Railway Company* that that blockade was justifiable because cars were upon the industrial track of the American Malting Company and prevented the shipping in or placing

in of other cars at that time, and was not being disposed of by that company, and for that reason they claim they were entitled to maintain the blockade. You will remember the testimony on the part of the plaintiff by the witnesses and the correspondence with reference to what occurred at or about that time, the direction, if any, which was given to the *Chicago, Milwaukee & St. Paul Railway Company* as to the disposition of those cars, and the effect of such direction, if it was given, may also be considered by you, in determining whether or not it was justifiable, the company claiming that it was justifiable because material upon the track was not being disposed of so as to open the track; on the other side, the plaintiff claiming that it was not justifiable because they had informed them that the material was valueless, that it should be taken out and dumped and permit the other twenty-one cars this suit is about to be moved up and disposed of. Now, you will have that testimony in mind together with all the other facts and circumstances, and all the other evidence that bears upon that question, and answer the question which is here submitted by 'Yes' or 'No.' "

The whole matter was thus plainly placed before the jury. The answer to the question of whether the *Milwaukee Company* was justified in refusing to complete the transit promptly after February 4, 1910, was made to turn on whether it was responsible for the blockade on the delivery track. On the one side it was claimed that the occupancy of such track was by cars of material which had been spoiled in transit and subsequently placed therein by the railroad company, and that respondents refused to receive them on that account and did nothing respecting them except to try and help the railway company out of its dilemma by, at its request, endeavoring, without success, to save some of the freighted property; that it was up to the *Milwaukee Company* from about February 4, 1910, to rescue itself from the situation by dumping such property out of the cars as worthless, or in some way clearing the way for the particular cars, and that it finally did so but too late. There was conflicting evidence in respect to the matter. It was peculiarly a jury

question. They answered it. The settled practice precludes our disturbing that answer, even if, as an original matter, we would incline to a different result.

It is urged that the cars which blocked the delivery track were occupied by respondents and so they became responsible for the blockade thereon. That is upon the theory that a delivery at the place for unloading is a delivery to the consignee. The authorities cited in support of the proposition, and principle as well, condemn it. It takes something more than mere delivery of a carload of freight at the unloading place to constitute a delivery of the subject of the transit into possession of the consignee. Reasonable opportunity for determining whether the carrier has performed its contract or not is required. If the property is found upon inspection, with reasonable diligence, to have been rendered worthless, or to have been materially injured while in the possession of the carrier, the consignee is not bound to accept the setting out of the car as a delivery of its burden. The consignee is not obliged to accept regardless of condition. He is entitled to reasonable time and opportunity to inspect the property and to reject it if rendered worthless or materially injured in the transit, or to take it without acceptance as having been transported according to contract. 2 Hutchinson, Carr. (3d ed.) § 733; 4 Elliott, Railroads, § 1528. That is elementary. It is laid down, as indicated, by most courts and text-writers. The authorities cited by counsel for appellant *Milwaukee Railway Company* are in harmony therewith.

So it does not follow, merely because the cars which caused the blockade were placed on the delivery track for the consignee, that the responsibility of the railway company, *ipso facto,* terminated, or that it was terminated because of some of the cars having been unloaded by the consignee. If within the reasonable time for inspection, the property was rejected as having been spoiled in transit, and the rejection was persisted in, the consignee only relenting to the extent of ac-

commodating the railway company in its efforts to minimize the loss caused by its wrongfully delaying the transit, then there was no efficient delivery as regards the claim of respondents in this case.

It is suggested that, as matter of law, the *Milwaukee Company* should not be held liable for damage to material in transit which was accepted by the *Alton Company* after it received notice of the embargo. About half the cars in question were so received. The last of the cars reached the transfer point about the time the embargo should have been lifted. There is nothing to indicate that the *Alton Company* had any reason to expect the necessities of the *Milwaukee Company* would cause any considerable delay, certainly not that delay would be caused by its fault. Had the property accepted for transit after notice of the embargo reached it at East St. Louis, become worthless before termination of justifiable continuance of the embargo, it alone would be liable for the loss. In receiving the cars before notice of termination of the embargo, it took the risk of loss without right of action against the *Milwaukee Company* in case of the latter justifiably refusing to accept such cars at the delivery point until the subject of the transaction became worthless.

When a railroad company, from the reasonable necessities of the situation, having regard to self-protection and duty to the public, declares an embargo, in form, to continue until further notice, or by custom to so continue, it is up to the shipper and initial carrier by reasonable inquiry to find out whether there has been a change in the situation before sending forward freight. *Riddle, Dean & Co. v. B. & O. R. Co.* 1 Int. Comm. Rep. 778. That would hold good until lapse of such time as to render further continuance of the embargo clearly unreasonable; but would not preclude a carrier, circumstanced as the *Alton* was in this instance, from accepting freight for transportation, as here, at its own risk of the embargo being actually lifted by the act of the connecting car-

rier, or constructively lifted because of the reasonable basis for it no longer existing, in time for the through transit to be completed. The *Alton Company* took that risk in this case. The embargo was constructively lifted February 4, 1910. According to the finding of the jury about such time the twenty-one cars were at the transfer point and their burden, except as to one, was in merchantable condition. So the mere acceptance of the freight by the *Alton Company* and routing it at a through rate over its and the *Milwaukee* line before the latter terminated the embargo, cuts no figure in this case. It is sufficient that it ought to have terminated the interference and received the freight at a time when the transit contemplated should have been successfully completed. The situation is the same as if the *Milwaukee Company* had, on the 4th day of February, 1910, given notice of a termination of the embargo and the *Alton Company* had then accepted the freight from the respondents and made due tender of it to the *Milwaukee Company* to execute its part of the entire transit.

A railroad company must have reasonable ground for instituting an embargo, or it is illegal. The carrier cannot declare an embargo as a shield against its inexcusable fault nor unreasonably continue it as such shield. If legal when instituted its continuance is illegal when there is no basis for it other than its own culpable negligence or wilful neglect. Barnes, Interstate Transp. § 352.

Other questions are suggested by counsel for consideration, some of which are covered by the previous discussion and others are not deemed of sufficient importance, in view of the conclusions already stated, to warrant extending this opinion. The major questions are whether the expressed exemption of liability became a part of the contracts of affreightment, whether the contracts were for a through transit, and whether the *Milwaukee Company* was responsible for the condition which moved it, during the embargo period, to refuse to deliver the twenty-one cars within the period after the 4th of

February, 1910, before the subject of the transit became worthless. The decision of all in respondents' favor leaves nothing of importance for consideration.

*By the Court.*—Judgment affirmed on both appeals.

TIMLIN, J., dissents.