## NETHERWOOD v. RAYMER.

### (District Court, W. D. Wisconsin. April 30, 1918.)

1. CONTRACTS ⬡═26—ACCEPTANCE—DEPOSIT OF ACCEPTANCE IN MAILS.

When an offer is made by letter sent by mail, the deposit of a letter of acceptance by the person to whom the offer is made, properly addressed, completes the contract, though it is never received by the one making the offer.

2. CONTRACTS ⬡═2—EXECUTION—WHAT LAW GOVERNS.

The execution of a contract must be determined by the laws of the place where the contract is made.

3. CONTRACTS ⬡═144—CONSTRUCTION—WHAT LAW GOVERNS.

The construction of a contract must be determined by the laws of the place where the contract is made.

4. SALES ⬡═22(4)—PROPOSAL—ACCEPTANCE.

Where an offer to sell is made by mail, no contract results if the acceptance is coupled with any condition which varies or adds to the offer to sell.

5. CONTRACTS ⬡═28(2)—ACCEPTANCE OF OFFER—CONSTRUCTION.

Where one to whom an offer by mail was made used the mails as a medium for acceptance, extrinsic evidence is admissible to clear up question whether the letter of acceptance intended to impose a new condition, or merely a suggestion as to the consummation of the contract.

6. SALES ⬡═22(4)—ACCEPTANCE—VARIANCE.

Where defendant, who held plaintiff's notes, given in payment for corporate stock, which was deposited as collateral offered to sell at a discount, *held*, that there was no variance between the offer and acceptance, because the acceptance did not include interest.

At Law. Action by Harry C. Netherwood against George W. Raymer. Judgment for plaintiff.

On July 1, 1911, the defendant sold to the plaintiff 23 shares of the capital stock of the Democrat Printing Company. The purchase price was $65,000, of which $5,000 was paid in cash, and 10 notes for $6,000 each, payable at the Capital City Bank of Madison, Wis., on or before 10 years from date, were given for the balance. The 23 shares of stock were pledged as collateral to the notes, and the collateral contract contained an insecurity clause, whereby the defendant, at any time when he deemed the debt insecure, could sell the stock. At the time of the negotiations between the parties, which make the subject-matter of this case, all interest had been paid when due, and $2,000 on the principal.

Early in 1914 the defendant became disturbed over the affairs of the Democrat Printing Company. In reply to defendant's letter, the plaintiff wrote that the affairs of the company were in good shape, but telling him further that, if he felt that his security was in danger, plaintiff would have no trouble in negotiating a new loan or making a sale of the stock in order to take care of his indebtedness.

On March 14, 1914, defendant wrote to the plaintiff as follows:

"Positively confidential.

"965 N. Y. Avenue, Pasadena, Cal., March 14, 1914.

"Dear Mr. Netherwood: My letter to you of Feby. 20th remains unanswered, although several others sent out in the same mail have been. I will now offer you three propositions. These are simply for you, and for no one else, not even for that trouble maker, Doc. Bryant. I think you must know by this time that you must shake him. He will ruin you if you don't do it. You must certainly see that he will wreck any business or any person with which he is connected. I fully understand the difficulty that confronts you in dis-

posing of Bryant, but hope you can find a way out. The first proposition may be the most troublesome, because it goes right to the end sought without frills. The second and third I think you may act upon. The second I earnestly hope you can carry out. It saves you $5,800, the equal of two years' interest on all your debt. This I will give to close out all my relations with the company. However, the third proposition is the easy one for you, and you can simply say that under the circumstances you feel that you cannot meet your indebtedness and you simply throw up your hands. Mr. Netherwood, I am so fully advised that it is beyond question that affairs cannot run but a little longer as now. There must be the change mentioned in my first proposition, to prevent a peaceful or forceful reorganization of the company. That would air some things like the monthly meeting of directors and their pay. All are in the office and already being paid large salaries. You must know that every dollar of stock not owned or controlled by you and Bryant will insist on a reorganization other than that of Doc. Bryant.

"First. You to agree to letting Bryant and Osborne out and that your pay may be fixed at $5,400, as formerly. This you can do if you will, and it will benefit you more than any one else. You know Bryant is absorbing $3,600 a year of the earnings of the company, and his services are worth nothing, besides being a pernicious and constant meddler and trouble maker. You stand by him, and he will wreck both of you; but he will not be permitted to wreck the Democrat Printing Company. *He must go out.* The salary of Osborne, fixed by Bryant, is fully three times what any service he can render is worth.

"Second. You stated in a former letter to me that you knew that you would have no trouble in negotiating a new loan or a sale of the stock for more than the amount of the unpaid notes. If you can and will, I will agree to discount for cash all the notes in the sum of $5,800, or 10 per cent.; that is, I will accept $52,200 for the $58,000 of unpaid notes. I will be more than glad to do this, but have little faith that you can, for I very much fear that the stock has been depreciated still more by Bryant's management, and I am sure it will be still more if Bryant is much longer kept in the office in any capacity whatever.

"Third. You to resell to me for your notes all the stock bought of me. I will surrender to you all your unpaid notes for the stock, and will be only too glad to sell it again at any time for $52,200 cash. While this is the easy way out of an unfortunate combination for you, it is the hardest one for me. The man Bryant will wreck any business that he has any connection with.

"Finally. I am constrained to question one or two matters in your last letter to me. I feel that you have not fully analyzed the situation. You speak of not sacrificing what you have in the company. You have paid $7,000. As I understand it, all of this was from earnings of the company, as well as all the interest you have paid out, and in addition a salary of $2,400 a year, which is $500 a year more than you were getting when I sold you my stock. Now, just what actual interest could you in fact claim? This I leave to you. Also you state that your notes are not due until 1921. Am I to understand that you can, if you choose, defer payment on all of these notes until 1921, if you find it convenient to do so. If I thought that was so, I would present you with all of them now.

"Mr. Netherwood, I am not blaming you for Bryant's mismanagement of affairs, because I know full well the bad combination you have gone into and the puzzle you have on your hands to get out of it. But you must get out or sink in the wreck that impends now in the affairs of the company. With the load you are carrying you cannot hope to pay dividends, and discontent is rampant among the outside stockholders, and that man Bryant has no more sense than to believe he can do anything he pleases with the property of others, simply because he with your assent permits him to do it, and he has no more honesty than to believe that is right. You cannot afford to longer keep such company. If you buy my stock outright, that lets me out. If you resell the stock to me, that frees you from the deal you have been in, and you are saved endless trouble and financial loss. I am anxious only to get difficulties straightened out there, and I assure you I am by no means alone in

this. Don't plunge deeper into trouble, but get out, and do it now; and it cannot be done, except by the methods, or some one of them, offered, or of some one that will accomplish the result.

"Hoping that you will see the situation and act for your own good, and that will be for the good of all interests concerned, with best wishes, I am,

"Very truly yours,                                    Geo. Raymer.

"Please let me have an early reply.                              R."

That letter reached Madison, Wis., on March 21, 1914, and on the same day the plaintiff wrote to the defendant as follows:

"Madison, Wisconsin, March 21, 1914.

"Mr. George Raymer, 965 New York Ave., Pasadena, Cal.—My Dear Mr. Raymer: I am to-day in receipt of your letter of March 14th. Since I received your letter of Feb. 13th, I have been very much disturbed about the matter. In view of the fact that you evidently feel yourself insecure, I beg to advise you that, if you will execute to Mr. Hobbins power of attorney in the form herewith inclosed and forward the same to Mr. Hobbins, with full authority and power to assign the notes in the bank to which my stock is collateral security, making the assignment in blank, but without recourse against you, my indebtedness to you on these notes will be fully taken care of.

"I want you to understand that I am not putting up this money, but that the notes are being sold by you without recourse to a third party, who takes them off your hands; the understanding being that the notes are to be turned over upon the payment of $52,200 to Mr. Hobbins, or a discount of 10 per cent. from the face of the notes and interest. Power of attorney is herewith inclosed. This is in accordance with your favor of the 14th, and gives you your money, so that you need not have any further worry as far as you are concerned about the matter. Please write to me when you forward this power of attorney to Mr. Hobbins, so that you get your money without any delay. With best regards to you and yours, I am

"Very truly yours,                              H. C. Netherwood."

Before the defendant received the plaintiff's letter of March 21st, Brandenberg, another stockholder in the Printing Company, went to California and saw the defendant at Pasadena on March 20, 1914. Defendant then offered to sell Brandenberg the Netherwood notes for $52,200. Brandenberg accepted the offer, and told the defendant that he would return to Madison, Wis., and place the money to purchase the Netherwood notes to defendant's credit in the Capital City Bank.

On March 26, 1914, not having heard from his letter of the 21st, plaintiff telegraphed the defendant as follows:

"Madison, Wis., March 26, 1914.

"George Raymer, 965 New York Ave., Pasadena, California:

"Please wire me whether you have received my letter of Saturday last and when you will forward power of attorney to Mr. Hobbins period. Also wire him that you are forwarding power of attorney to him at my request.

"Harry Netherwood."

On the same day defendant sent the following telegram to the plaintiff:

"Pasadena, Calif., March 26, 1914.

"H. S. Netherwood, Madison, Wisc.:

"Letter and telegram just received. Notes not owned by me.

"Geo. Raymer."

Brandenberg completed his purchase of the notes at the Capital City Bank of Madison, Wis., and immediately foreclosed on the collateral, which was sold on March 28, 1914, for more than enough to pay the balance due on the notes. At this sale the plaintiff was compelled to pay $58,000 in order to protect his security. At the time of the sale to Brandenberg, plaintiff had the money ready in Madison, Wis., to consummate the defendant's offer made in his letter of March 14, 1914.

Plaintiff contends that his letter of March 21, 1914, posted on that day and addressed to the defendant at his California home, was an acceptance of the

offer contained in the defendant's letter of March 14th, and that a contract between the parties resulted.

Defendant claims that the plaintiff's letter of March 21st was not an acceptance of any offer made by the defendant; that it changed material terms of the defendant's offer, and amounted to, at the most, a counter proposition, which was never accepted by the defendant.

Sanborn & Blake, of Madison, Wis., for plaintiff.

Jones & Schubring, of Madison, Wis., for defendant.

CARPENTER, District Judge (after stating the facts as above). [1] The determination of this case depends entirely upon the construction to be given to the defendant's letter of March 14, 1914, and the plaintiff's reply, posted at Madison, Wis., on March 21, 1914, the date when he received the defendant's letter. If there was a contract made, it was consummated by the mailing of the letter by plaintiff at Madison, Wis., properly addressed to the defendant at Pasadena, Cal.

"For it is well settled, in England and this country, that when a proposal for a contract is made by letter, sent by mail, the deposit of a letter of acceptance in the post office by the person to whom the proposal is made, addressed to the person making it, at the proper place, completes the contract, even though the latter never receives the letter accepting his offer." Washburn v. Fletcher, 42 Wis. 152, 166.

[2, 3] The execution of the contract and its construction must be determined by the laws of the place where the contract, if any, was made. McFarlane v. Wadhams (C. C.) 165 Fed. 987; Liverpool, etc., v. Insurance Co., 129 U. S. 397, 458, 9 Sup. Ct. 469, 32 L. Ed. 788; Berget-Crittenden Co. v. Railway Co., 159 Wis. 256, 261, 150 N. W. 496.

[4] The law of the state of Wisconsin with reference to offers and acceptances by mail is well summarized in Curtis L. & L. Co. v. Interior L. Co., 137 Wis. 341, 118 N. W. 853, 129 Am. St. Rep. 1068:

"The vendee in his letter of acceptance may not attach any condition to such acceptance, even to the extent of undertaking to dictate the place where payment shall be made. If his attempted acceptance is coupled with any condition that varies or adds to the offer to sell, it is not an acceptance, but is in reality a counter proposition. N. W. Iron Co. v. Meade, supra [21 Wis. 474, 94 Am. Dec. 557]; Baker v. Holt, supra [56 Wis. 100, 14 N. W. 8]. Where the letter of acceptance contains a mere suggestion or request that payment be made at a particular place, but such a request is not a condition attached to the acceptance, it does not amount to an attempt to vary the terms of the offer to sell, and will not defeat an action for specific performance. Matteson v. Scofield, 27 Wis. 671; Kreutzer v. Lynch, 122 Wis. 474, 100 N. W. 887. Applying these principles of law to the errors under consideration, the case does not present any unusual difficulties."

The Wisconsin cases cited by counsel for the defendant are Baker v. Holt, 56 Wis. 100, 14 N. W. 8, N. W. Iron Co. v. Meade, 21 Wis. 474, 94 Am. Dec. 557, Clark v. Burr, 85 Wis. 649, 55 N. W. 401, and Russell v. Falls Mfg. Co., 106 Wis. 329, 82 N. W. 134.

In the first two of these cases the letter of acceptance changed the place of payment from the vendor's domicile to a different place many miles away. In the Clark Case it asked for a deduction of nearly one-half the purchase price, and in the Russell Case there were three material modifications.

Other Wisconsin cases, in which, under somewhat similar conditions, the letter of acceptance has been held to contain a mere suggestion, and not a variation in the terms, are the following: Matteson v. Scofield, 27 Wis. 671; Sherley v. Peehl, 84 Wis. 46, 54 N. W. 267; Kreutzer v. Lynch, 122 Wis. 474, 100 N. W. 887; Curtis L. & L. Co. v. Interior L. & L. Co., 137 Wis. 341, 118 N. W. 853, 129 Am. St. Rep. 1068.

[5] In the Kreutzer Case, numerous Wisconsin decisions were referred to in the opinion, and we find this summary:

"Each of the letters so considered was marked by some slight differentiation from that in the present case; but these varying views of court at least serve to establish that such a letter is not necessarily clear or certain in its significance, but may contain a measure of ambiguity. In both Matteson v. Scofield and Baker v. Holt it is held that such ambiguity might be resolved by extrinsic facts surrounding the transaction and by the conduct of the parties. In the present case there was evidence of conversation between the parties which might have served as an invitation to Mr. Kreutzer to suggest a method of closing the transaction by mail—the defendant Lynch having suggested to him that that might be done. Again, correspondence between and conduct of the parties after the sending of the letter of June 17th was offered as significant upon the meaning of this letter and the understanding of it by Mr. Lynch. Upon this evidence the trial court has found that the request for transmission of the deed and abstract to a bank at Wausau was intended by Mr. Kreutzer and was understood by the defendants simply as a suggestion and request, and not as a condition of acceptance. There being extrinsic evidence admissible upon this subject, with no clear and overwhelming preponderance to the contrary, the finding of the court must conclude us on this question."

Defendant charges that the letter of acceptance contained an important variation, in that it required the defendant to appoint an attorney or agent of the plaintiff's own choosing to receive the money and to close the transaction. The agent named was J. W. Hobbins, cashier of the Capital City Bank of Madison, Wis. The original notes were payable at the bank, and plaintiff paid his interest there and part of the principal as it fell due.

Under the rule laid down in the Kreutzer Case, extrinsic evidence is admissible to clear up the question whether or not the letter in question contained a condition or merely a suggestion. The facts surrounding the transaction and the conduct of the parties make it clear that Netherwood's letter contains simply a suggestion, and not a condition. All of the notes were "on or before," and could have been paid by Netherwood at any time, had he desired to go to the Capital City Bank and deposit the money. The record shows that J. W. Hobbins was the president and cashier of this particular bank; that the notes were in the possession of the bank, and all payments of interest, and the two payments of principal on these notes had been made to Hobbins at the bank; that he was the active managing officer of the Capital City Bank, and when payments were made of principal or interest he personally indorsed them on the notes in the presence of Netherwood. The indorsements show that those payments ran over a period of years; the first being August 5, 1911, and the last March 7, 1914. Hobbins was not connected in any way with the Democrat Printing Company, or in any way with the stockholders

of the company. The Democrat Company carried their account at the Capital City Bank, and the defendant Raymer had a checking account at the same bank; it being his working bank account, so far as he had one in Wisconsin. He also had one in California. The notes in question, when they were foreclosed on by Brandenberg, were sold at the Capital City Bank, and the transaction the defendant had with Brandenberg was also consummated through the Capital City Bank. The cash which the plaintiff had raised to consummate the purchase from the defendant was in the Capital City Bank, and he was ready, able, and willing to carry out his part of the contract.

It is plain that the plaintiff in his letter of acceptance named J. W. Hobbins simply as a suggestion, for the purpose of aiding in the immediate winding up of the transaction. It appears from the record that all parties in interest had the utmost confidence in Hobbins; that he personally had taken charge of all the dealings with regard to these notes from the time of their execution, and he naturally was the one man at the bank who would have closed the transaction, had the name of the bank been inserted in the power of attorney, instead of his name. Raymer had been dissatisfied for some time with the conduct of affairs in the publishing company, and was extremely anxious to get his money, or the major part of it. He had manifested anxiety for some time, and had committed himself on this point in writing. His letter containing the offer of sale shows that his anxiety was acute, and this anxiety the plaintiff was trying to relieve, when he wrote back, on the same day that he received the offer, accepting it and suggesting Mr. Hobbins, "so that you get your money without any delay."

The importunity on the part of the aged defendant to close out this transaction and to get as much of his money as possible at the earliest date was further evidenced by the manner in which he accepted Bandenberg's offer immediately on its presentation March 20th. This was before he had heard from Netherwood. He states:

"After a few minutes of conversation, Mr. Brandenberg said he had come out to see if I would sell him Netherwood's notes. I quickly answered that I would."

The reasons for the defendant's anxiety are clearly shown in his communication. Raymer, when he received the plaintiff's letter of March 21st, would have understood that his proposition was accepted, and that only the details of consummating the agreement remained to be disposed of. The suggestion of Hobbins seems to me to be an attempt on the part of the plaintiff to save time, so that he could comply with the very evident desire of the defendant to get his $52,200 at once.

It should be particularly noticed that the failure of the defendant to carry out his contract with Netherwood was not due to any claim on his part that he had any objection to executing the power of attorney to Mr. Hobbins. Without waiting for an answer to his offer, without leaving enough time in which an answer could possibly be received, and before his offer was received, he sold these notes to Brandenberg on exactly the same terms as contemplated in his offer

to Netherwood. The Brandenberg transaction would have been carried out under Netherwood's letter of acceptance, with the exception that the indorsement, "Without recourse, George W. Raymer," was put on the Netherwood notes at the Capital City Bank under a general power of attorney held by Jones & Schubring, instead of the specific power of attorney to J. W. Hobbins inclosed in Netherwood's acceptance.

Under all the circumstances, I am of the opinion that the naming of Hobbins as the attorney in fact was in expedition of the sale rather than a condition of acceptance or counter offer.

I am not impressed with the argument that the three propositions were for Netherwood's sole benefit, and that no one else could be interested with him in the transaction, because Raymer's letter refers to a statement of the plaintiff that he would have no trouble "negotiating a new loan or sale of the stock for more than the unpaid notes."

[6] It is also charged that there is a variance in that the acceptance did not comprehend $52,200 principal and also the interest to date of sale. I fail to see that interest was a part of the defendant's offer. In addition to the above extract Raymer also stated:

"I will agree to surrender all your notes for a surrender of the stock, and I would gladly sell it again at once for the sum of $52,200 cash."

The interest was paid up to a very recent date, and the amount then outstanding was so small in proportion to the total amount involved that I do not believe the question of interest was considered by the defendant. It evidently was not mentioned by him as a part of his offer.

The other objections raised by the defendant do not have any particular significance in this situation.

An order will be entered, finding the issues in favor of the plaintiff, and assessing his damages at the sum of $5,800 and interest thereon from March 28, 1914.

Judgment will be entered on the finding; exceptions being preserved by the defendant.